UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MARLA FOX                                                CIVIL ACTION
O/B/O HMB

VERSUS                                                   NUMBER: 16-16892

NANCY A BERRYHILL, ACTING                                SECTION: "N"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying Plaintiff's application for Supplemental Security Income ("SSI") benefits.  (Rec. docs. 13, 16).

On June 9, 2014, Marla Fox, mother of the Plaintiff-in-interest herein, HMB, filed an application for SSI benefits on behalf of the minor child, alleging disability as of March 20, 2014, the date of the child's birth.  (Tr. pp. 85-93).  In a "Disability Report-Child" form that appears in the administrative record below, the child's disabling condition was identified as Dandy-Walker Syndrome/hydrocephalus.  (Tr. pp. 97-102).  Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process on August 22, 2014.  (Tr. pp. 53-56).  Pursuant to Plaintiff's request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on December 1, 2015 at which Ms. Fox, who was unrepresented by counsel, appeared and testified.  (Tr. pp. 57, 58-60, 28-43).  On December 22, 2015, the ALJ issued a written decision in which he concluded that Plaintiff-in-interest was not disabled within the meaning of the Social Security Act.  (Tr. pp. 8-27). The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's

decision on November 14, 2016, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-3). It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In what is the rough equivalent of her cross-motion for summary judgment, Plaintiff essentially challenges the sufficiency of the evidence supporting the Commissioner's decision, submitting in support thereof medical records that both pre-date and post-date the ALJ's decision. (Rec. doc. 13). Relevant to the resolution of that challenge are the following findings that were made by the ALJ:

1.   The claimant was born on March 20, 2014. Therefore, he was a newborn/young infant on May 6, 2014, the date [the] application was filed, and is currently an older infant (20 CFR 416.926a(g)(2)).[1]

2.   The claimant has not engaged in substantial gainful activity since May 6, 2014, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: hydrocephalus and Dandy Walker [S]yndrome (20 CFR 416.924(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.   The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.   The claimant has not been disabled, as defined in the Social Security Act, since May 6, 2014, the date the application was filed (20 CFR 416.924(a)).

(Tr. pp. 14, 24).

---

[1] Although the ALJ identified May 6, 2014 as the date that the application was filed, a review of the application itself reveals a filing date of June 9, 2014. (Tr. pp. 85-93).

Judicial review of the Commissioner's decision to deny SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 590, 592 (5th Cir. 1983). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant, whether a child or an adult, bears the burden of proving that he is disabled within the meaning of the Social Security Act. *Fraga*, 810 F.2d at 1301; 20 C.F.R. §416.912(a). In making a disability determination on a child, the Commissioner uses the three-step sequential analysis set forth in 20 C.F.R. §416.924, as follows:

1. Determine whether the child engaged in substantial gainful activity during the relevant time frame and, if not;

2. Determine whether the child has a medically determinable severe impairment and, if so;

3. Determine whether the impairment meets, medically equals, or

is functionally equal to an impairment set forth in the Listing of Impairments, Appendix 1, Subpart P, Part 404.

See *Verrett v. Commissioner of Social Security*, No. 99-CV-3647 2001 WL 179922 at *1 n. 7 (E.D. La. Feb. 20, 2001)

In determining whether a child's impairment is functionally equivalent to one of those set forth in the Listing of Impairments, the Commissioner considers the child's limitations in the following six domains: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being. 20 C.F.R. §416.926a(b)(1). To be functionally equal to a listing and thus of listing-level severity, the child must have "marked" limitations in two of the six domains or an "extreme" limitation in one domain. 20 C.F.R. §416.926a(a). In evaluating a child's ability to function in each domain, the Commissioner is to consider: (1) the activities the child is able to perform; (2) the activities the child is not able to perform; (3) which of the child's activities are limited or restricted compared to children of the same age who do not have impairments; (4) whether the child has difficulty with activities at home, in childcare, at school, or in the community; (5) whether the child has difficulty independently initiating, sustaining, or completing activities; and (6) what kind of help the child needs to do activities, how much, and how often. 20 C.F.R. §416.926a(b)(2); *Maps ex rel. M.J. v. Astrue*, 09-CV-2226, 2010 WL 1946662 at *8 (N.D. Tex. Apr. 30, 2010), *adopted*, 2010 WL 1948363 (N.D. Tex. May 13, 2010).

In the present case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the date that the application for SSI benefits was filed and that he suffered from severe impairments in the form of hydrocephalus and Dandy Walker Syndrome. (Tr. p. 14).

However, those impairments did meet or medically equal the severity of one of those set forth in the Listing of Impairments, particularly Sections 11.04 and 112.12. (*Id.*). At the time of the ALJ's decision, the former listing provided that a claimant would presumptively be deemed to be disabled if he suffered from the following:

> 11.04 *Central nervous system vascular accident.* With one of the following more than 3 months post-vascular accident:
>   A.    Sensory or motor aphasia resulting in ineffective speech or communication; or
>   B.  Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

As the introductory statement to Section 11.04 makes clear, that listing requires proof of a central nervous system vascular accident which is absent from this case. As all of the specified criteria in Section 11.04 are not present, listing-level severity is not established. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990). With respect to the other listing that was cited by the ALJ, Section 112.2, that listing provided that a child would be deemed disabled if he suffered from the following:

> 112.2 *Developmental and Emotional Disorders of Newborn and Younger Infants (Birth to attainment of age 1)*:   Developmental or emotional disorders of infancy are evidenced by a deficit or lag in the areas of motor, cognitive/communicative, or social functioning.   These disorders may be related either to organic or to functional factors or to a combination of these factors.
>   The required level of severity for these disorders is met when the requirements of A, B, C, D, or E are satisfied.
> A.  Cognitive/communicative functioning generally acquired by children no more than one-half of the child's chronological age, as documented by appropriate medical findings (e.g., in infants 0-6 months, markedly diminished variation in the production or imitation of sounds and severe feeding abnormality, such as problems with sucking, swallowing, or chewing) including, if necessary, a standardized test;
> OR
> B.  Motor development generally acquired by children no more than one-half the child's chronological age, documented by appropriate medical findings, including if necessary, a standardized test;

5

OR

C.   Apathy, over-excitability, or fearfulness, demonstrated by an absent or grossly excessive response to one of the following:

1.   Visual stimulation; or

2.   Auditory stimulation; or

3.   Tactile stimulation;

OR

D.   Failure to sustain social interaction on an ongoing, reciprocal basis as evidenced by:

1.   Inability by 6 months to participate in vocal, visual, and motoric exchanges (including facial expressions); or

2.   Failure by 9 months to communicate basic emotional responses, such as cuddling or exhibiting protest or anger; or

4.   Failure to attend to the caregiver's voice or face or to explore an inanimate object for a period of time appropriate to the infant's age;

OR

E.   Attainment of development or function generally acquired by children no more than two-thirds of the child's chronological age in two or more areas (*i.e.*, cognitive/communicative, motor, and social), documented by appropriate medical findings, including if necessary, standardized testing).

Here, again, listing-level severity is simply not established by the objective evidence of record.  The Court is directed to no medical findings documenting deficits in cognitive or communicative functioning as required by paragraph "A" of Section 112.12.  To the contrary, at the time of his examination by Dr. Lori McBride on September 8, 2015, when HMB was nearly 18 months of age, he was described as "doing great ... alert, happy, and playful," developmentally on-track, and "... repeating words pretty well and say[ing] lots of things" although he was often hard to understand.  (Tr. pp. 218-219).  For the first time, the child's head circumference fell in the normal range.  (*Id.*).  In terms of deficits in motor development as required by Section 112.12(B), Dr. McBride observed that HMB was "... already pulling up to stand and [was] cruising along the furniture," letting go at times to take a few steps.  (*Id.*).  On physical examination, HMB was "... alert, happy, and interactive," fixing his gaze well on objects and faces and tracking them with full extraocular movements.  (*Id.*).  There is also no evidence of apathy, over-excitability, or fearfulness resulting from stimulation as required

6

by Section 112.12(C).  In the more recent medical records that were furnished by Ms. Fox, she reported to Dr. McBride on March 1, 2016 that HMB was "doing great," using a variety of words and seeming to understand everything that was said to him, being "… alert, happy, and playful … having a good time walking all around the clinic room and checking everything out." (Rec. doc. 13-1, pp. 23-24).  In the most recent treatment note from Dr. McBride, dated March 28, 2017, it was reported that the child "… has been doing just fine," was "… developmentally completely normal," and he was characterized as a friendly, happy baby who spoke in two to three-word sentences, understood what was said to him, and was able to run and climb.  As deficits in social functioning or overall development are not apparent from the record, HMB also fails to satisfy the criteria of Section 112.12(D) or (E) and substantial evidence supports the ALJ's finding that the child's impairment did not meet or medically equal the criteria of a condition set forth in the Listing of Impairments.

Next, the ALJ engaged in the functional equivalence analysis required by §416.926a, finding that HMB had a less-than-marked limitation in the domain of health and physical well-being and no limitations in any of the other five domains enumerated in §416.926a(b)(1).  In the domain of acquiring and using information, the ALJ first took notice of the Function Report that Ms. Fox had completed on June 9, 2014, when HMB was at a tender age of less than three months, in which she indicated that the child did not play games such as "peek-a-boo," understand simple statements, point to things he wanted, or understand the names of favorite toys or things.  (Tr. pp. 18-19).  However, Ms. Fox also reported that HMB turned his head when his name was called and was attentive to familiar voices and noises.  (*Id.*).  Cited by the ALJ as more persuasive were the contemporaneous treatment notes of HMB's treating physicians, Dr. Sandra Robinson and Dr. McBride, that

HMB was doing well, was developmentally on-track, and was essentially a completely normal baby. (Tr. pp. 218-224, 232-235). Faced with some of that same evidence, Dr. Gerald Dzurik, a State Agency medical consultant in the field of pediatrics, similarly concluded that HMB had no limitation in the domain of acquiring and using information. (Tr. pp. 45-52). Opinions like those of Dr. Dzurik are entitled to considerable weight in a Social Security proceeding. 20 C.F.R. §416.927(e)(2)(i). The ALJ's finding in this domain was supported by substantial evidence.

In the domain of attending and completing tasks, Social Security Regulations provide that a young infant should be able to respond to various stimuli in the environment in the form of fixing his gaze on a human face, stopping his activity when hearing voices or other sounds, and attending to and following various moving objects with his gaze, including people or toys. 20 C.F.R. §416.926a(a)(2)(i). Attention to tasks should increase as the child matures through ages one to three. 20 C.F.R. §416.926a(h)(2)(ii). Here, even before HMB had attained the age of three months, Ms. Fox reported that he stopped crying when he was picked up, that he watched the face of the person talking to him, that he turned his head in the direction of familiar noises or voices or when his name was called, that he smiled at the faces of those he knew, and that he became quiet or stopped crying when he saw a familiar person. (Tr. p. 105). More recent reports from HMB's parents to Dr. McBride confirm consistent progress and HMB was described as "doing great" and "developmentally completely normal" with normal muscle tone, strength, and coordination. (Rec. doc. 13-1, pp. 22, 23-24). Like Dr. Dzurik, the ALJ found that HMB had no limitation in the domain of attending and completing tasks. (Tr. pp. 48, 19-20). Substantial evidence supports that finding.

Next, in the domain of interacting and relating with others, the Regulations require inquiry into how well a child initiates and sustains emotional connections with others, develops and uses language skills, cooperates with others, complies with rules, responds to criticism, and respects the possessions of others.  20 C.F.R. §416.926a(i).  Newborns and infants should be able to form intimate relationships by gradually responding visually and vocally to caregivers and should also begin to develop speech.  20 C.F.R. §416.926a(i)(2)(i).  Older infants and toddlers should be able to express emotions, respond to the feelings of others, and eventually speak words clearly enough to be understood most of the time.  20 C.F.R. §416.926a(i)(2)(ii).  In this case, Ms. Fox reported that when HMB was less than three months of age, he made various "cooing" sounds, stopped crying when he was picked up and held, watched the face of the person talking to him, turned his head when his name was called, smiled at familiar faces, and cuddled in the arms of his caregivers.  (Tr. p. 105).  By September 8, 2015, at the age of nearly 18 months, HMB was repeating words fairly well and was becoming increasingly vocal.  (Tr. pp. 218-219).  The most recent medical report of March 28, 2017 indicates that the child was speaking in two to three-word sentences and seemed to understand everything that was said to him.  (Rec. doc. 13-1, p. 22).  Like Dr. Dzurik, the ALJ found that HMB had no limitation in the domain of interacting and relating with others.  The ALJ's determination is supported by substantial evidence.

In the domain of moving about and manipulating objects, consideration is given to a child's gross and fine motor skills, how he or she moves his body from one place to another and manipulates things.  20 C.F.R. §416.926a(j).  As observed by the ALJ, when HMB was less than three months of age, Ms. Fox reported that he could not yet perform various physical maneuvers such as rolling from his stomach to his back and vice-versa, could not get to a

sitting position without help, could not stand up without holding on to someone or something, and could not hold small objects between his fingers. (Tr. pp. 105-106). However, even before he had attained the age of one, HMB was "crawling very well," was able to pull up to stand and to "... cruise along the furniture," and appeared to be ambidextrous, reaching for toys, bringing them up to midline, and transferring objects from hand to hand. (Tr. pp. 223-224). One year later, on March 1, 2016, Dr. McBride reported that HMB was "using both hands equally ... [and] walking all over the place" and a motor exam demonstrated normal tone and equal strength throughout. (Rec. doc. 13-1, pp. 23-24). Most recently, at approximately the age of three, HMB was observed to be "... running and even climbing," age-appropriate milestones as set forth in §416.926a(j)(2)(ii). (*Id.* at p. 22). Substantial evidence supports the ALJ's finding of no limitation in the domain of moving about and manipulating objects.

The domain of caring for yourself requires an evaluation of how well a child maintains a healthy emotional and physical state including how well he gets his wants and needs met in an appropriate way, how he copes with stress and changes in the environment, and whether he takes care of his own health, possessions, and living area. From birth to the attainment of age one, inquiry is made into the child's ability to recognize his body's signals and to alert his caregiver of those needs. 20 C.F.R. §416.926a(k)(2)(i). For older infants and toddlers, consideration is given to the child's efforts at becoming more independent. 20 C.F.R. §416.926(k)(2)(ii). In this case, HMB at an early age made cooing sounds, stopped crying after being picked up and held, and was responsive to familiar noises, voices, and faces. (Tr. p. 105). In March of 2015, he was described as "... alert, happy, and interactive." (Tr. pp. 223-224). One year later, HMB was becoming more verbal and understanding of

everything that was said to him and was curious and explorative of his surroundings. (Rec. doc. 13-1, pp. 23-24). On March 28, 2017, HMB's parents advised Dr. McBride that HMB was developmentally completely normal. (*Id.* at p. 22). Just like Dr. Dzurik, the ALJ determined that HMB had no limitation in the domain of caring for himself. Those determinations are supported by substantial evidence.

The final domain to be considered in the §416.926a functional equivalence analysis is that of health and physical well-being. 20 C.F.R. §416.926a(b)(l)(vi). In that domain, consideration is given to the cumulative effects of a child's physical or mental impairments, and their associated treatments and therapies, on the child's functioning. Examples of limitations in the domain of health and physical well-being include generalized symptoms such as weakness, dizziness, agitation, lethargy, or psychomotor retardation; somatic complaints such as seizures or convulsive activity, headaches, incontinence, recurrent infections, etc.; functional limitations resulting from treatment; exacerbations from one or more impairments that interfere with physical functioning; and, medical fragility requiring intensive medical care to maintain health and physical well-being. In this domain the ALJ found, as had Dr. Dzurik, that HMB had a less-than-marked impairment in health and physical well-being. Substantial evidence supports that finding. The medical evidence reflects that shortly after his birth on March 20, 2014, HMB was admitted to Children's Hospital on May 1, 2014 for insertion of a right frontal ventriculoperitoneal shunt. (Tr. pp. 140-141). His condition improved dramatically the next day and by May 3, 2017, he was tolerating formula very well and was described as alert and comfortable while surveying his hospital room. (Tr. pp. 134-135). In a discharge summary of that same date, Dr. McBride reported that HMB's "... family feels like he is at his baseline activity wise." (*Id.*). The

possibility of a second catheter was discussed.  (*Id.*).

As noted in the medical records discussed above, at the age of six months HMB's parents reported that he was "... essentially a completely normal baby" who did everything Ms. Fox's older children had done at the same age.  (Tr. pp. 220-221).  Based upon that level of improvement, the placement of a second catheter was not thought to be necessary.  (*Id.*).  At three years, HMB was "doing fine" and was felt to be developmentally completely normal; he was thus to return for follow-up in one year.  (Rec. doc. 13-1, p. 22).  While Ms. Fox recently reports that HMB has fallen behind in toilet training and in learning colors, the objective medical evidence discussed above, particularly that which was generated during the time that HMB's case was pending before the Commissioner, easily supports the ALJ's find that the child had a less than marked impairment in the domain of health and physical well-being.  There being no "marked" limitations in two of the §416.926a(b)(1) domains or an "extreme" limitation in one, functional equivalence is simply not established.

In a Social Security proceeding like this one, the Court's task is to determine whether substantial evidence of record supports the Commissioner's decision, a highly deferential standard of review.  *Fortenberry v. Harris*, 612 F.2d 947, 950 (5th Cir. 1980).  Based upon a review of the record as a whole, the Court believes that the Commissioner's decision is supported by substantial evidence and should be affirmed.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that Plaintiff's suit be dismissed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[2]

New Orleans, Louisiana, this  12th  day of _____December_____, 2017.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[2] *Douglass* referenced the previously-applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.

13